UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| M.D., | Case No.  23-cv-01995-LJC |
| Plaintiff, | **ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND DENYING DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT** |
| v. | |
| MARTIN O'MALLEY[1], et al., | |
| Defendants. | Re: ECF Nos. 14, 16 |

Plaintiff M.D.[2] challenges the final decision of the Commissioner of Social Security denying her applications for disability insurance benefits under Title II and Title XVI of the Social Security Act.  Both parties have consented to magistrate judge jurisdiction (ECF Nos. 7, 10) and moved for summary judgment.  ECF Nos. 14, 16.  M.D. filed a reply in support of her Motion for Summary Judgment.  ECF No. 18.  Having considered the parties' briefing, and for the reasons discussed below, M.D.'s Motion for Summary Judgment is **GRANTED**, the Commissioner's Cross-Motion for Summary Judgment is **DENIED**, and this matter is **REMANDED** for further proceedings.

I.      BACKGROUND

A.      Factual Background

M.D. is a 50-year-old woman who has a lengthy history of mood disorders, anxiety,

---

[1] Martin O'Malley is now the Commissioner of Social Security and is automatically substituted as a party pursuant to Fed. R. Civ. P. 25(d).  *See also* 42 U.S.C. § 405(g) (action survives regardless of any change in the person occupying the office of Commissioner of Social Security).

[2] Because opinions by the Court are more widely available than other filings, and this Order contains potentially sensitive medical information, this Order refers to the Plaintiff only by her initials.  This Order does not alter the degree of public access to other filings in this action provided by Rule.

1   depression, obsessive compulsive disorder (OCD), self-harming, and alcohol dependence.  ECF

2   No. 11-8 at 26–27.[3]  M.D. also has posttraumatic stress disorder (PTSD) related to her experience

3   of childhood sexual abuse.  *Id.* at 51.  She has a history of five psychiatric hospitalizations

4   beginning from the age of 17 for reasons including cutting and alcohol-induced psychosis.  *Id.*

5   According to M.D., her heavy alcohol use began at the age of 16, when she would consume "1/2 a

6   pint almost every day" with periods of binge drinking.  *Id.*  She also started using

7   methamphetamine at the age of 16, although she stopped around 2006.  *Id.*  In the past, M.D. has

8   attended both residential and outpatient substance treatment programs.  *Id.*  M.D. did not graduate

9   from high school but did obtain her GED.  *Id.* at 52.  She previously attended college classes at

10  California State University, East Bay but was three classes short of completing her bachelor's

11  degree when she dropped out.  *Id.*; *see also* ECF No. 11-3 at 93.  The last time she worked was in

12  2012, when she was in training to operate a switchboard for an answering service.  ECF No. 11-3

13  at 90.

14        Approximately one month before her alleged disability onset date of December 1, 2015,

15  M.D. was prescribed Wellbutrin, Prozac, Abilify and Trazodone through a psychiatrist at Contra

16  Costa Health Services.  ECF No. 11-8 at 65.  She told the psychiatrist that when she is on her

17  medications, she feels better.  *Id.* at 64.  M.D. had another appointment on December 23, 2015,

18  where she reported being depressed, sleeping a lot, and not wanting to get up out of bed, although

19  she would get up to go to school.  *Id.* at 68.  She was not seen again until May 16, 2016, when

20  M.D. admitted that she had relapsed from alcohol, stopped going to Alcoholics Anonymous (AA),

21  had difficulty getting out of bed, and was failing her college classes.  *Id.* at 47.  M.D. withdrew

22  from college in the Spring of 2016 reportedly due to psychiatric symptoms.  *Id.* at 52.

23        M.D. began attending regular psychiatric appointments from June through December

24  2016.  *Id.* at 70–77.  M.D. told her psychiatrist, Dr. Jee Hyun Guss, that she was sober and

25  attending AA meetings "almost daily" with someone accompanying her.  *Id.* at 76.  However, she

26  was still reporting depressed mood, anxiety, medication side effects, low energy, among many

27

---

28  [3] Unless specified otherwise, the Court refers to the PDF page number generated by the Court's e-filing system.

United States District Court
Northern District of California

United States District Court
Northern District of California

other mental health symptoms.  *Id.* at 74, 76.  She stopped going to see Dr. Guss in December 2016 and did not return until June 13, 2017.  *Id.* at 78.  At that time, she admitted that she stopped taking her medications three weeks prior and reported increased depression symptoms.  *Id.*  M.D. told Dr. Guss that the "only thing" she was doing well was staying sober.  *Id.*  She began individual therapy in August 2017, but only continued therapy bi-monthly through October 2017. *Id.* at 93–102.

In December 2017, M.D. relapsed on alcohol and was kept on a psychiatric hold for homicidal ideation.  *Id.* at 90.  She later admitted to Dr. Guss that she had not been consistently taking her medications as prescribed in the weeks before she relapsed.  *Id.* at 91.  M.D. returned to therapy on February 1, 2018, and told her therapist that she believed the relapse was triggered by the stress related to her mom trying to sell their house.  *Id.* at 103.  She and her mother moved to Turlock, CA in April 2018.  *Id.* at 108.  That same month, she told Dr. Guss that she was continuing to maintain her sobriety and that she was looking to get affiliated with a new AA community in the area.  *Id.*  Dr. Guss gave M.D. medication refills while she found a new mental health provider in Turlock.  *Id.* at 109–10.

On January 22, 2019, M.D. went to urgent care after experiencing five days of constant anxiety and nervousness, associated with dizziness, irritability, and an inability to sleep.  ECF No. 11-14 at 131.  She had stopped taking her medications back in July 2018 after she was no longer receiving refills from Dr. Guss.  *Id.* at 473.  Urgent care helped M.D. restart all her medications. *Id.*  However, on March 7, 2019, she went to the emergency room due to alcohol relapse.  *Id.* at 250.  M.D. returned to psychotherapy in April 2019, but in May 2019, she was hospitalized for seven days for suicidal ideation.  *Id.* at 19, 515.  M.D. admitted to drinking a pint and a half of liquor daily the last month to try to "control herself."  *Id.*  While hospitalized, she was officially diagnosed with bipolar disorder.  *Id.*  Her antidepressants were discontinued, as the doctor believed she was incorrectly being treated for depression and the medication was putting her in a "mixed manic irritable state."  *Id.* at 20.  Instead, she was prescribed Olanzapine and Oxcarbazepine.  *Id.* at 21.

On June 28, 2019, M.D. was in a car accident after she rear-ended another vehicle while

intoxicated and injured the other passenger. *Id.* at 4. She was taken to the emergency room by police and medically cleared for incarceration. *Id.* at 319–20. This was her fourth DUI. *Id.* at 5. M.D. sought emergency care for anxiety and panic attacks on July 28 and August 1, 2019. *Id.* at 2–11, 141–42. She expressed suicidal ideation during her August 1, 2019 emergency care visit related to her June 28, 2019 DUI arrest and her fear of going to jail. *Id.* at 4. She was hospitalized for five days, and her medications were adjusted. *Id.* Her alcohol abuse was described as "in remission" upon discharge. *Id.* at 10.

During a March 11, 2020 mental health intake appointment, M.D. told the medical provider that she had not abused any alcohol since her DUI arrest. *Id.* at 552. She reported depressed mood, issues with eating and sleeping, fatigue, and loss of energy nearly every day, as well as excessive anxiety and worry about many things. *Id.* She had to be hospitalized from July 22, 2020, to August 9, 2020, for diabetic ketoacidosis and acute pancreatitis. *Id.* at 40. She went into respiratory failure and had to be intubated. *Id.* During an October 27, 2020 psychiatry appointment, M.D. denied any suicidal or homicidal ideations, but reported increased anxiety and restlessness. *Id.* at 577. Her medications were adjusted again during this visit. *Id.* at 580.

**B.    Procedural history**

M.D. applied for Title II disability benefits and Title XVI supplemental security income in June 2016 based on her alcoholism, OCD, depression, and anxiety. ECF No. 11-6 at 4–16. M.D.'s applications were denied on November 18, 2016. ECF No. 11-5 at 2–6. On February 13, 2017, her requests for consideration were also denied. *Id.* at 9-14. On December 6, 2018, after holding two hearings, Administrative Law Judge (ALJ) David LaBarre issued an unfavorable decision against M.D. ECF No. 11-3 at 54–74. M.D. appealed the decision to the Appeals Council, which denied her Request for Review on November 22, 2019. ECF No. 11-10 at 23–29. On January 21, 2020, M.D. filed an action for judicial review in this District pursuant to 42 U.S.C. § 405(g). *Id.* at 37–39. On July 24, 2020, the court approved the parties' Stipulation to Voluntary Remand Pursuant to Sentence Four of 42 U.S.C. § 405(g) and to Entry of Judgment for Plaintiff. *Id.* at 40–42. On remand, the Appeals Council sent the case back to an ALJ and directed him or her to re-evaluate the opinion evidence in accordance with 20 C.F.R. §§ 404.1527 and 416.927,

United States District Court
Northern District of California

explaining the weight given to the opinions rather than their level of persuasiveness. *Id.* at 46–47.

Per instructions from the Appeals Council, ALJ Vincent Minsenti held a hearing on December 17, 2020. ECF No. 11-9 at 56. The ALJ issued an unfavorable decision against M.D. on February 26, 2021. *Id.* at 16–55. In particular, the ALJ found M.D. disabled, but that her alcoholism was a contributing factor material to the determination of disability, and she would not be disabled if she stopped her substance use. *Id.* at 35, 46. M.D. once again appealed the decision to the Appeals Council (*id.* at 13–15), but the Appeals Council declined to assume jurisdiction on February 28, 2023. *Id.* at 2–8. At that point, the ALJ's February 2021 decision became the final decision of the Commissioner pursuant to 42 U.S.C. § 405(g). M.D. filed the present action seeking judicial review of the ALJ's decision on April 24, 2023. *See* ECF No. 1.

## II.     LEGAL STANDARD

### A.     Standard of Review and Governing Law

Under Title II of the Social Security Act, disability insurance benefits are available when an eligible claimant is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A).[4] To determine a claimant's eligibility for benefits, the ALJ engages in a five-step sequential evaluation process to determine whether a claimant is disabled under the Act. 20 C.F.R. § 404.1520(a)(1). To establish disability, the claimant bears the burden of showing (1) that they are not working; (2) that they have a severe physical or mental impairment or a combination of impairment(s) that is severe; (3) that the impairment(s) meet or equal the requirements of a listed impairment; and (4) that their residual functional capacity (RFC) precludes them from performing their past relevant work. *Id.* § 404.1520(a)(4). At step five, the burden shifts to the Commissioner to show that the claimant has the RFC to perform other work that exists in significant numbers in the national economy. *Hoopai v. Astrue*, 499 F.3d 1071, 1074 (9th Cir. 2007). If the Commissioner conclusively finds the claimant "disabled" or "not disabled" at any point in the five-step process,

---

[4] Because the Title II and Title XVI regulations are identical, only the Title II regulations are cited herein.

1    he does not proceed to the next step.  20 C.F.R. § 404.1520(a)(4).

2           Pursuant to 42 U.S.C. § 405(g), a district court has authority to review a Commissioner's

3    decision to deny disability benefits to a claimant.  "The ALJ is responsible for determining

4    credibility, resolving conflicts in medical testimony, and for resolving ambiguities."  *Ahearn v.*

5    *Saul*, 988 F.3d 1111, 1115 (9th Cir. 2021) (quoting *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th

6    Cir. 1995)).  The district court's role is "to ensure that the [ALJ's] decision was supported by

7    substantial evidence and a correct application of the law."  *Ludwig v. Astrue*, 681 F.3d 1047, 1051

8    (9th Cir. 2012).  "'Substantial evidence' means more than a mere scintilla, but less than a

9    preponderance, i.e., such relevant evidence as a reasonable mind might accept as adequate to

10   support a conclusion."  *Robbins v. Social Sec. Admin.*, 466 F.3d 880, 882 (9th Cir. 2006).  The

11   Court must "consider the entire record as a whole, 'weighing both the evidence that supports and

12   the evidence that detracts from the Commissioner's conclusion.'"  *Lingenfelter v. Astrue*, 504 F.3d

13   1028, 1035 (9th Cir. 2007) (quoting *Reddick v. Chater*, 157 F.3d 715, 720 (9th Cir. 1998)).

14   "Where the evidence can reasonably support either affirming or reversing the decision, [this

15   Court] may not substitute [its] judgment for that of the Commissioner."  *Parra v. Astrue*, 481 F.3d

16   742, 746 (9th Cir. 2007).

17           **B.      Standards for Evaluating Cases Involving Drug and Alcohol Addiction**

18           In cases involving substance abuse (such as M.D.'s), which the Social Security

19   Administration (SSA) refers to as drug and alcohol addiction (DAA), the ALJ is required to

20   "apply the appropriate [five-step] sequential evaluation process twice."  Social Security Ruling

21   (SSR) 13-2p, 2013 WL 621536, at *6 (Feb. 20, 2013); *accord Bustamante v. Massanari*, 262 F.3d

22   949, 955 (9th Cir. 2001) (interpreting 20 C.F.R. § 404.1535).  The two-step process is necessary

23   because "[a] claimant cannot receive disability benefits 'if alcoholism or drug addiction would ...

24   be a contributing factor material to the Commissioner's determination that the individual is

25   disabled.'"  *Parra*, 481 F.3d at 746 (quoting 42 U.S.C. § 423(d)(2)(C)).

26           During the first "round" or "stage" (round one), the "ALJ conducts the five-step inquiry

27   without separating out the impact of [DAA]," to determine whether the claimant is disabled.

28   *Bustamante*, 262 F.3d at 955; *see also* SSR 13-2p, 2013 WL 621536, at *6.  If, considering all of

United States District Court
Northern District of California

the claimant's medically determinable impairments, the ALJ determines during round one that the claimant is disabled, and there is medical evidence showing DAA, then the ALJ must proceed to the second "round" or "stage" (round two) to determine whether the DAA is "material" to the finding that the claimant is disabled, "appl[ying] the sequential evaluation process a second time to document materiality[.]" SSR 13-2p, 2013 WL 621536, at *6. "Materiality" is the degree to which an individual would still be found disabled if they stopped using drugs or alcohol. *See* 20 C.F.R. § 404.1535(b).

During round two, the ALJ "project[s] the severity of the claimant's other impairment(s) in the absence of DAA." SSR 13-2p, 2013 WL 621536, at *4, 7. In so doing, the ALJ "evaluate[s] which of [the claimant's] current physical and mental limitations... would remain if [the claimant] stopped using drugs or alcohol and then determine[s] whether any or all of [the claimant's] remaining limitations would be disabling." 20 C.F.R. § 404.1535(b)(2). If the ALJ determines that the claimant's "remaining limitations are disabling... independent of [the claimant's DAA]," then the ALJ "will find [DAA] is not a contributing factor material to the determination of disability," and the claimant is deemed disabled. *Id.* § 404.1535(b)(2)(ii). By contrast, if, absent the DAA, the claimant's "remaining limitations would not be disabling," the ALJ will determine that DAA "is a contributing factor material to the determination of disability," and will find claimant not disabled. *Id.* § 404.1535(b)(2)(i).

## III.    DISCUSSION

M.D. raises three challenges to the ALJ's decision. First, she argues that the ALJ "failed to consider the required factors" and "failed to provide specific and legitimate reasons" for the weight given to the medical opinions of record. ECF No. 14 at 16. Second, she argues that the ALJ "erred in discrediting M.D.'s statements about her symptoms." *Id.* Third, she argues that the ALJ's decision "to reject the third-party witness statement was not supported by substantial evidence." *Id.* M.D. separately requests that the Court remand to the SSA for an immediate award of benefits under the Ninth Circuit's "credited-as-true" rule. *Id.* at 28–29.

### A.    Medical Opinion Evidence

Because M.D. brought her original claim in 2016, the SSA's pre-2017 regulations apply,

which require ALJs to "give greater weight to certain medical opinions." *Farlow v. Kijakazi*, 53 F.4th 485, 488 (9th Cir. 2022). "Opinions from treating physicians receive more weight than opinions from examining physicians, and opinions from examining physicians receive more weight than opinions from non-examining physicians." *Id.*

M.D. challenges the ALJ's evaluation of two medical opinions, one from Dr. Guss, her treating psychiatrist, and the other from Dr. David Glassmire, an impartial medical expert and non-examining physician who testified at the hearing before the ALJ after reviewing the record.

### 1.    Dr. Jee Hyun Guss

On June 28, 2018, Dr. Guss submitted to the SSA a two-page, check-box form called a Medical Source Statement which opined that: (1) M.D.'s "symptoms of mood and anxiety interfere [with her] ability to follow instructions due to low energy"; (2) M.D. "[r]equires assistance from family to engage in and complete tasks"; (3) MD is "frequently anxious when leaving home environment, resulting in avoidance"; and (4) MD is "unable to live independently in the community." ECF No. 11-8 at 120–21.

"The medical opinion of a claimant's treating physician is given 'controlling weight' so long as it 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the claimant's] case record.'" *Trevizo v. Berryhill*, 871 F.3d 664, 675 (9th Cir. 2017) (quoting 20 C.F.R. § 404.1527(c)(2)). If an ALJ decides to give a treating physician's opinion less than controlling weight, the ALJ must do two things. First, the ALJ must consider other factors "such as the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability, consistency with the record, and specialization of the physician." *Id.* at 676 (citing 20 C.F.R. § 404.1527(c)(2)–(6)). Consideration must also be given to other factors, whether raised by the claimant or by others, or if known to the ALJ, including the amount of relevant evidence supporting the opinion and the quality of the explanation provided; the degree of understanding a physician has of the Commissioner's disability programs and their evidentiary requirements; and the degree of his or her familiarity with other information in the case record. 20 C.F.R. § 404.1527(c)(6); *Orn v. Astrue*, 495 F.3d 625, 631 (9th Cir. 2007). Failure to consider the

United States District Court
Northern District of California

1  factors listed under Section 404.1527(c)(2)–(6) "alone constitutes reversible legal error." *Trevizo*,

2  871 F.3d at 676.

3        Second, the ALJ must provide reasons for rejecting or discounting the treating

4  physician's opinion.  The legal standard that applies to the ALJ's proffered reasons depends on

5  whether the treating physician's opinion is contradicted by another physician.  When a treating

6  physician's opinion is not contradicted by another physician, the ALJ must provide "clear and

7  convincing" reasons for rejecting or discounting the opinion, supported by substantial evidence.

8  *Id.* at 675.  When a treating physician's opinion is contradicted by another physician, an ALJ must

9  provide "specific and legitimate reasons" for rejecting or discounting the treating physician's

10 opinion, supported by substantial evidence.  *Id.*  "The ALJ can meet this burden by setting out a

11 detailed and thorough summary of the facts and conflicting clinical evidence, stating his

12 interpretation thereof, and making findings."  *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir.

13 1989) (quotations and citation omitted).

14       Here, Dr. Guss was M.D.'s treating psychiatrist, but the ALJ did not give controlling

15 weight to her medical opinion.  Instead, the ALJ only gave it "great weight" during round one of

16 the five-step sequential evaluation process as to it pertained to M.D.'s mental functioning during

17 periods of alcohol abuse and "little weight" during round two as it pertained to M.D.'s mental

18 functioning during periods of sustained sobriety.  ECF No. 11-9 at 32, 43.  The ALJ erred,

19 however, when he failed to consider any factors under 20 C.F.R. § 404.1527(c) beyond

20 supportability and consistency, such as the extent of the treatment relationship M.D. had with Dr.

21 Guss or the frequency of examination.  *Id.* at 31–32, 42–43.  This "alone constitutes reversible

22 legal error."  *Trevizo*, 871 F.3d at 676; *see Newman A. v. Berryhill*, No. 17-CV-03010-JSC, 2019

23 WL 1385900, at *7 (N.D. Cal. Mar. 27, 2019) (remanding for further proceedings in part because

24 the ALJ "failed to apply the appropriate factors as required under" the regulations, including

25 length of the treatment relationship and the frequency of examination);  *J.Z. v. Saul*, No. 20-CV-

26 00154-LB, 2021 WL 3493744, at *9 (N.D. Cal. Aug. 9, 2021) ("Because the ALJ did not apply

27 the factors listed in 20 C.F.R. § 404.1527 in determining the extent to which the opinion should be

28 credited…the rejection [of the treating physician's opinion] was reversible legal error.").

Even if the ALJ had considered all the necessary regulatory factors, he failed to properly explain why he credited the opinions of non-examining and non-treating doctors over the opinion of Dr. Guss.  Because Dr. Guss's opinion was contradicted by other physicians that provided a medical opinion as to M.D., the "specific and legitimate reasons" standard applies.  *Trevizo*, 871 F.3d at 675.  Here, the ALJ gave several reasons for rejecting Dr. Guss's opinion, none of which meet the "specific and legitimate reasons" standard.

### a.        Alcoholism

During round one of the five-step sequential evaluation process, the ALJ found that Dr. Guss's opinion is "generally consistent with [M.D.'s] functioning when abusing alcohol."  ECF No. 11-9 at 32.  He noted that her "long history of alcoholism…significantly worsened her mental impairments and resulted in repeat psychiatric hospitalizations for self-injurious behavior and suicidal ideation," and that "[d]uring periods of alcohol abuse," M.D. "presented as tearful, anxious, depressed and tremulous, and demonstrated increased OCD-type behaviors…"  *Id.*  As such, the ALJ believed that the limitations Dr. Guss opined were more consistent with the "objective findings and self-reports of impaired functioning" that were in the record during periods where M.D. was abusing alcohol.  ECF No. 11-9 at 32.  During round two, the ALJ found that Dr. Guss's opinion is "inconsistent with the evidence of record" because she did not consider M.D.'s alcohol use disorder.  *Id.* at 43.  He cited to evidence in the record which purportedly shows that "[d]uring periods of sobriety," M.D.'s mental symptoms significantly improved.  *Id.*

However, Dr. Guss herself never opined that M.D.'s mental impairments are or are not worsened during periods of alcohol abuse.  In fact, her medical opinion is from June 2018 (ECF No. 11-8 at 121), and at that time, M.D. was approximately six months sober.  *See* ECF No. 11-14 at 250.  Dr. Guss saw M.D. as a patient for approximately 1.5 years (ECF No. 11-8 at 121), and her medical notes indicate that she was aware of and treating M.D.'s alcohol dependency.  *See, e.g., id.* at 82 (listing "EtOH Use D/O" [Alcohol Use Disorder] as one of M.D.'s diagnoses and noting that she has been "able to maintain sobriety" and is "working with her sponsor, working the steps.").  But there is nothing in Dr. Guss's Medical Source Statement to show how she evaluated the effect that M.D.'s alcohol abuse has on her mental functioning.  Given the absence of this

10

United States District Court
Northern District of California

1  analysis, the ALJ erred in "separating out the impact" of M.D.'s alcoholism during the first round

2  of the five-step sequential evaluation process. *Bustamante*, 262 F.3d at 955; *see also Reese v.*

3  *Berryhill*, No. 17-CV-06655-DMR, 2019 WL 4738279, at *16 (N.D. Cal. Sept. 27, 2019) ("Here,

4  the ALJ cited Reese's drug use as a reason to undermine Dr. Ratto's findings on his mental

5  impairments.  This was a premature inquiry; under *Bustamante*, the ALJ should have completed

6  the five-step inquiry and then proceeded to consider Reese's drug use only if he found that Reese

7  was disabled"); *Kroeger v. Colvin*, No. 13-CV-05254-SI, 2015 WL 2398398, at *9 (N.D. Cal.

8  May 19, 2015) (finding that the ALJ erred during round one by rejecting "evidence of increased

9  severity of symptoms based on the notion that any evidence of increased severity was due to

10  plaintiff's substance use.").  Accordingly, M.D.'s alcoholism is not a specific and legitimate

11  reason for the ALJ to have given Dr. Guss's opinion less than controlling weight.

12                        **b.        Mental Status Examinations**

13           The ALJ also rejected Dr. Guss's opinion because her mental status examinations of M.D.

14  were "generally unremarkable with the exception of some anxious and/or depressed affect and

15  impaired judgment."  ECF No. 11-9 at 32, 43.  The ALJ noted that M.D. generally demonstrated,

16  *inter alia*, "normal speech, appropriate affect, pleasant demeanor," as well as "linear and goal-

17  directed thought processes…and intact cognition."  *Id.*  M.D. argues that her ability to behave

18  "normally" in a therapy session, which is less demanding than typical work settings, and where

19  she was often accompanied by a family member for support, is not substantial evidence that M.D.

20  could "withstand the stresses and duration of a full forty-hour in-person work week in a

21  competitive work setting."  ECF No. 14 at 18–19.

22           Although the ALJ fixates on the mental status examination findings, he ignores the fact

23  that these are side-by-side with Dr. Guss's narrative notes that otherwise corroborate her medical

24  opinion.  *See, e.g.*, ECF No. 11-8 at 74 (finding that M.D. was "groomed," presented "no gross

25  motor abn[ormalities]," and that her "speech [was] [within normal limits]," but also that she

26  "[f]eels low in energy" and "feels anxious and fearful of going out"); 105 (noting M.D.'s

27  "appropriate affect" but also that she feels anxious about going to AA meetings and interacting

28  with others).  The "narrative sections of [mental health] records provide pertinent details" that can

be inconsistent with a finding of "normal" or "intact" examinations.  *De La Cruz v. Kijakazi*, Case

No. 20-cv-05852-MMC, 2022 WL 1556411, at *8 (N.D. Cal. May 17, 2022).  Moreover, the ALJ

fails to explain how, for example, M.D.'s "normal speech" and "linear and goal-directed thought

processes" during brief psychiatry appointments with her trusted medical provider contradicts Dr.

Guss's opinion that M.D. has anxiety about going out in public or is unable to live independently

in the community.  *See Dierker v. Berryhill*, No. 18CV145-CAB(MSB), 2019 WL 246429, at *12

(S.D. Cal. Jan. 16, 2019), *report and recommendation adopted*, No. 18CV145-CAB-MSB, 2019

WL 446231 (S.D. Cal. Feb. 5, 2019) (finding that treating psychiatrist's "fairly intact" mental

status examination findings were of "limited relevance" to the psychiatrist's "opinions regarding

[the p]laintiff's mental work-related limitations.").  If anything, Dr. Guss's opinion that M.D.

requires assistance from family members to complete tasks is consistent with her frequently

needing a family member with her at psychiatry appointments for support.  *See, e.g.*, ECF No. 11-

8 at 82 (M.D. accompanied to August 30, 2017 appointment with Dr. Guss by her mother).  Thus,

Dr. Guss's mental status examination findings are not a specific or legitimate reason for rejecting

her medical opinion and giving it less than controlling weight.

### c.    Activities of Daily Living

Another reason the ALJ gave for rejecting Dr. Guss's opinion is that "[d]uring periods of

sobriety," M.D. "engaged in good activities of daily living, including successfully completing

college-level coursework and regularly reading books."  ECF No. 11-9 at 43.  But the treatment

records he cites where M.D.'s college classes were discussed are from before December 2015,

which is M.D.'s alleged onset disability date.  ECF No. 11-8 at 45–46, 64–65.  Such records are

"of limited relevance."  *Carmickle v. Comm'r, Soc. Sec. Admin.*, 533 F.3d 1155, 1165 (9th Cir.

2008).  Notably, M.D. stopped attending her college classes the same month as her alleged onset

disability date because she reported that she "couldn't handle" it anymore.  ECF No. 11-8 at 74.

The ALJ also cited to records from a September 22, 2017 appointment where M.D.'s therapist said

she had done her "homework," "discussed introversion with her mother as well," and "shared her

partnership plan with her mother."  *Id.* at 97.  When read in context, the therapist's notes clearly

are referring to "homework" assigned during therapy, and not college coursework.  The ALJ cited

1    to no evidence indicating that M.D. returned to school after dropping out in the Spring of 2016 due

2    to her worsening mental health symptoms.  *Id.* at 52.

3         The only evidence cited by the ALJ as to M.D.'s reading indicates that she "likes" reading,

4    not that she was doing so "regularly."  *Id.* at 82.  Moreover, even if M.D. is reading regularly, the

5    ALJ fails to explain how the "level of activity" required for reading is inconsistent with M.D.'s

6    "claimed limitations."  *Reddick*, 157 F.3d at 722.  It is not patently obvious how reading—a

7    solitary activity—is inconsistent with Dr. Guss's opinion, which focused on M.D.'s anxiety when

8    going out in public, her need for assistance to engage in and complete tasks, and her inability to

9    live independently in the community.  Reading is an activity that M.D. likely can start and stop at

10   will if her "symptoms of mood and anxiety" or "low energy" prevent her from continuing to read.

11   Neither reading nor M.D.'s college-level coursework provides a specific and legitimate basis for

12   giving Dr. Guss's opinion less than controlling weight.

                              **d.    Psychological Test Results**

13

14        Finally, the ALJ found that "when sober, [M.D.] achieved average scores in verbal

15   comprehension, perceptual reasoning, working memory, processing speech and full-scale IQ, and

16   low average scores in auditory memory, visual memory, immediate memory and delayed

17   memory."  ECF No. 11-9 at 32, 43.  According to the ALJ, "[t]hese clinical signs and laboratory

18   findings are wholly inconsistent with Dr. Guss'[s] opinion that [M.D.] has no useful mental ability

19   in several areas of mental functioning."  *Id.*  But Dr. Guss never opined that M.D. has an

20   intellectual disability, difficulty recalling information, difficulty comprehending information, or

21   difficulty thinking.  Dr. Guss opined that it is M.D.'s "symptoms of mood and anxiety" that

22   interfere with her ability to follow instructions.  ECF No. 11-8 at 120–21.  She also opined that

23   M.D.'s anxiety causes her to fear leaving her home, and that she needs assistance from family to

24   engage in and complete tasks.  *Id.*  M.D.'s "average" neuropsychological test results are not

25   necessarily inconsistent with Dr. Guss's opinion as to M.D.'s limitations.  *See Ghanim v. Colvin*,

26   763 F.3d 1154, 1164 (9th Cir. 2014) (rejecting the ALJ's reliance on "good eye contact, organized

27   and logical thought content, and focused attention" and "cognitive functioning" because they "do

28   not contradict [the plaintiff's] reported symptoms of depression and social anxiety.").  The ALJ's

United States District Court
Northern District of California

13

1    reasoning here thus fails to meet the specific and legitimate standard.

2         Given all the above, the ALJ erred when, after deciding to give Dr. Guss's opinion less

3    than controlling weight, he failed to consider any factors under 20 C.F.R. § 404.1527(c) beyond

4    supportability and consistency, and he failed to provide specific and legitimate reasons for

5    rejecting Dr. Guss's medical opinion.

6              **2.    David Glassmire, PhD**

7         The ALJ found that Dr. Glassmire's opinion was entitled to "partial weight" as it pertained

8    to M.D.'s periods of sobriety, but "little weight" as to periods of alcohol abuse.  ECF No. 11-9 at

9    33, 44–45.  Because the ALJ did not give Dr. Guss's opinion controlling weight, he was required

10   to weigh *all* medical opinions with consideration to the factors outlined in 20 C.F.R.

11   § 404.1527(c), including Dr. Glassmire's opinion.  The ALJ did not consider all these factors.  He

12   failed to note, for example, that Dr. Glassmire, an "impartial medical expert," never examined

13   M.D.  Nor did the ALJ discuss Dr. Glassmire's specialization and how it qualified him to opine on

14   M.D.'s medical conditions.  This "alone constitutes reversible legal error."  *Trevizo*, 871 F.3d at

15   676.[5]

16        According to M.D., the ALJ also ignored critical parts of Dr. Glassmire's testimony.  ECF

17   No. 14 at 21.  Specifically, he ignored Dr. Glassmire's testimony that: (1) M.D. being unable to

18   leave her home for days is consistent with her diagnoses; and (2) it is possible someone in the

19   same circumstances could miss 1–2 days of work per month and be off task more than the average

20   worker.  *See* ECF No. 11-3 at 129–31.  As noted below, *see supra* Section IV.D, the Court finds

21   that remand for further proceedings is appropriate in this case.  Because the ALJ erred in how he

22   evaluated Dr. Glassmire's medical opinion under 20 C.F.R. § 404.1527(c), on remand, the ALJ

23   must reevaluate Dr. Glassmire's entire opinion and its true consistency with the medical evidence

24

25   _____

26   [5] According to the Commissioner, because M.D. does not challenge the substance of any reasons
     the ALJ gave for how he weighed the opinion of Dr. Glassmire, she has forfeited the issue for
27   judicial review.  ECF No. 16 at 8.  The Commissioner is correct that M.D. is not challenging the
     substance of the reasons that the ALJ gave for partially rejecting Dr. Glassmire's opinion.  Instead,
28   M.D. challenges the ALJ's failure to weigh Dr. Glassmire's opinion with consideration to the
     factors outlined in 20 C.F.R. § 404.1527(c).  M.D. thus argues that the ALJ committed legal error,
     and the Court can properly consider the ALJ's adherence to SSA regulations on judicial review.

United States District Court
Northern District of California

1    of record.

2        **B.    M.D.'s Subjective Symptom Testimony**

3        M.D. argues that the ALJ failed to provide clear, and convincing reasons supported by

4    substantial evidence for discounting her symptom testimony.  ECF No. 14 at 21–27.  The Ninth

5    Circuit has "established a two-step analysis for determining the extent to which a claimant's

6    symptom testimony must be credited."  *Trevizo,* 871 F.3d at 678.  "First, the ALJ must determine

7    whether the claimant has presented objective medical evidence of an underlying impairment which

8    could reasonably be expected to produce the pain or other symptoms alleged."  *Id.* (quoting

9    *Garrison v. Colvin*, 759 F.3d 995, 1014–15 (9th Cir. 2014)).   If the claimant meets this

10   requirement and there is no evidence of malingering, "the ALJ can reject the claimant's testimony

11   about the severity of her symptoms only by offering specific, clear and convincing reasons for

12   doing so.  This is not an easy requirement to meet: The clear and convincing standard is the most

13   demanding required in Social Security cases."  *Id.*  To satisfy the "clear and convincing reasons"

14   requirement, "[g]eneral findings are insufficient; rather, the ALJ must identify what testimony is

15   not credible and what evidence undermines the claimant's complaints."  *Brown-Hunter v. Colvin*,

16   806 F.3d 487, 493 (9th Cir. 2015) (quoting *Reddick*, 157 F.3d at 722).

17       In weighing the claimant's credibility, the ALJ may consider many factors, including

18   "(1) ordinary techniques of credibility evaluation, such as the claimant's reputation for lying, prior

19   inconsistent statements concerning the symptoms, and other testimony by the claimant that

20   appears less than candid; (2) unexplained or inadequately explained failure to seek treatment or to

21   follow a prescribed course of treatment; and (3) the claimant's daily activities."  *Tommasetti v.*

22   *Astrue*, 533 F.3d 1035, 1039 (9th Cir. 2008) (quoting *Smolen v. Chater*, 80 F.3d 1273, 1284 (9th

23   Cir. 1996)).  The ALJ's reasons also must be supported by substantial evidence in the record.

24   *Thomas v. Barnhart,* 278 F.3d 947, 959 (9th Cir. 2002).

25       Here, the ALJ found during the first round at step four of the five-step sequential

26   evaluation process that M.D.'s medically determinable impairments—depression, mood disorder,

27   anxiety, and alcoholism—could reasonably be expected to produce the alleged symptoms.  ECF

28   No. 11-9 at 26.  The ALJ made no finding of malingering.  Therefore, the ALJ could reject M.D.'s

United States District Court
Northern District of California

15

United States District Court
Northern District of California

1  "testimony about the severity of her symptoms only by offering specific, clear and convincing

2  reasons for doing so." *Trevizo*, 871 F.3d at 678.

3         The ALJ gave several reasons for rejecting M.D.'s symptom complaints, none of which

4  satisfy the "clear and convincing reasons" standard.

### 1.   Stability and Improvement with Sobriety

6         During round two of the five-step sequential evaluation process, the ALJ found that M.D.'s

7  symptom testimony was inconsistent with the medical evidence of record in part because "when

8  not abusing alcohol, [M.D.'s] mental impairments significantly improved." ECF No. 11-9 at 38,

9  42.  He cited to various treatment records, including records from one of her medical providers,

10 Dr. Tina Nhatthi Tonnu, who concluded that M.D.'s "mood stabilizes well when she is sober and

11 takes her medications regularly." *Id.* at 39 (citing ECF No. 11-8 at 21).  The ALJ also cited to

12 records where M.D. "noted it was easier to get out of bed" which "indicates [M.D.'s] motivation

13 improved with sobriety and psychotropic medication management." *Id.* (citing ECF No. 11-8 at

14 45–46).

15        However, the ALJ once again relied on medical records from before M.D.'s alleged onset

16 disability date.  Her alleged onset disability date is December 1, 2015.  ECF No. 11-9 at 19.  Dr.

17 Tonnu's notes that M.D.'s "mood stabilizes well when she is sober and takes her medications

18 regularly" is from February 2014.  ECF No. 11-8 at 21.  M.D.'s comment about it being easier to

19 get out of bed is from November 2014.  *Id.* at 45.  As noted above, such records are "of limited

20 relevance." *Carmickle*, 533 F.3d at 1165.  More importantly, as M.D. points out, the record shows

21 that she did struggle significantly with her mental health at times even during periods of sobriety.

22 For example, there are medical records from October 15, 2016, *after* her alleged onset disability

23 date, where M.D. indicated that she was "low in energy," "stay[ed] in bed," had been "gaining

24 weight" because she was eating more, and that she had "felt depressed for a long time," but it had

25 been "worsening over the past couple of months." ECF No. 11-8 at 74.  At that point, she had

26 been sober for two months, yet her psychiatrist, Dr. Guss, found that she "[continued] to endorse

27 [significant symptoms] of depressed mood and anxiety that are not fully managed by her current

28 [medication] regimen." *Id.* at 74–75; *see also id.* at 78 (medical records from a June 13, 2017

16

1   psychiatry appointment where M.D. reported that she had "been feeling down" and that it was

2   "hard to get things done around the house," but the "only thing" she was doing "well is staying

3   sober.").

4   　　　　Moreover, "[o]ccasional symptom-free periods ... are not inconsistent with disability."

5   *Ghanim*, 763 F.3d at 1162 (quoting *Lester v. Chater*, 81 F.3d 821, 833 (9th Cir.1995)).  In cases

6   involving co-occurring DAA and mental disorders, the ALJ must "evaluate which of [the

7   claimant's] current physical and mental limitations ... would remain if [she] stopped using drugs or

8   alcohol and then determine whether any or all of [her] remaining limitations would be disabling."

9   20 C.F.R. § 404.1535(b)(2).  The Ninth Circuit has "distinguish[ed] between substance abuse

10   contributing to the disability and *the disability remaining after the claimant stopped using drugs*

11   *or alcohol.*  The two are not mutually exclusive.  Just because substance abuse contributes to a

12   disability does not mean that when the substance abuse ends, the disability will too."  *Sousa v.*

13   *Callahan*, 143 F.3d 1240, 1245 (9th Cir. 1998).  Here, just because M.D.'s depressed mood

14   improved and her motivation increased at times during periods of sobriety does not mean that they

15   would improve to the point of non-disability. *See Holohan v. Massanari*, 246 F.3d 1195, 1205

16   ("That a person who suffers from severe panic attacks, anxiety, and depression makes some

17   improvement does not mean that the person's impairments no longer seriously affect her ability to

18   function in a workplace.").

19   　　　　M.D.'s treatment records must also be "read in context of the overall diagnostic picture."

20   *Id*.  As the ALJ himself recognized, M.D. was diagnosed with bipolar disorder in May 2019.  ECF

21   No. 11-9 at 22, 30.  By focusing on M.D.'s "periods of relative well-being," the ALJ was

22   "essentially ignor[ing] the nature" of M.D.'s bipolar disorder, "a disease that is, by definition,

23   episodic." *Dodghson v. Berryhill*, No. 17-CV-02602-MEJ, 2018 WL 2047453, at *11 (N.D. Cal.

24   May 2, 2018) (quoting *Edler v. Astrue*, 391 Fed. App'x. 599, 601 (9th Cir. 2010)); *see also Witt v.*

25   *Colvin*, No. 3:13-CV-01550-SI, 2014 WL 6750329, at *8 (D. Or. Dec. 1, 2014) (finding that the

26   ALJ erred in failing to consider the plaintiff's bipolar disorder and the fact that it "is episodic in

27   nature and Plaintiff has good days and bad days.").  "Given the episodic nature of bipolar disorder,

28   short-lived improvements in functioning are consistent with the diagnosis." *Buck v. Colvin*, 540 F.

United States District Court
Northern District of California

App'x 772, 773 (9th Cir. 2013).  Thus, M.D.'s alleged "improvement" during certain periods of sobriety is not a clear and convincing reason for rejecting her symptom testimony.

### 2.    Mental Status Examinations

As with Dr. Guss's medical opinion, the ALJ rejected M.D.'s symptom testimony in part because "when not abusing alcohol, [her] mental status examinations were largely unremarkable and documented normal speech, euthymic mood with congruent affect, linear and goal-directed thought processes, normal thought content, fair-to-good judgment and intact cognition."  ECF No. 11-9 at 39.  He found that M.D.'s "generally stable mood, logical thought processes, average intelligence and good judgment are inconsistent with her allegations she cannot maintain concentration longer than 45 minutes and support an ability to understand, remember and carry out simple, routine and repetitive tasks."  *Id.* at 42.  For the reasons explained above, this was not a "specific and legitimate" reason for rejecting Dr. Guss's medical opinion, and therefore, it is not a "clear and convincing" reason for rejecting M.D.'s symptom testimony, given that the "clear and convincing" standard is "the most demanding required in Social Security cases."  *Trevizo,* 871 F.3d at 678.

Here, M.D. testified in part that her anxiety disorder made her "anxious around people" and that her depression made it difficult to "leave the house" or "participat[e] in life in any way." ECF No. 11-9 at 65–66.  As noted above, "normal" mental status examination findings during brief one-on-one mental health appointments are not necessarily inconsistent with M.D.'s claimed limitations.  *See Dierker*, 2019 WL 246429, at *12.  And there are narrative notes side by side with the mental status examination findings that do corroborate her impairments.  *See, e.g.*, ECF No. 11-8 at 105.  Moreover, the Ninth Circuit has repeatedly emphasized that an ALJ "may not discredit the claimant's testimony as to the severity of symptoms merely because they are unsupported by objective medical evidence."  *Reddick*, 157 F.3d at 722; *see also Barboza v. Astrue*, No. C -12-01153(EDL), 2013 WL 12181773, at *8 (N.D. Cal. May 28, 2013) (rejecting ALJ's finding that the plaintiff's testimony was not credible because of her "normal" mental status exams and Global Assessment of Functioning (GAF) scores, given that the "entire record" was "mixed" and showed that "her struggles with her mental illness were ongoing.").

### 3.   Activities of Daily Living

The ALJ also rejected M.D.'s symptom testimony because of its purported inconsistency with her "good activities of daily living." ECF No. 11-9 at 39. One of the activities pointed to by the ALJ was the fact that M.D. was "doing well in her college-level courses for environmental studies." *Id.* As with his analysis of Dr. Guss's medical opinion, the ALJ cited to records from before M.D.'s alleged onset disability date. Specifically, he cited to records from November 2014, April 2015, and November 2015 (ECF No. 11-8 at 45–46, 64–67), before December 1, 2015, and well before she dropped out of college in the Spring of 2016 due to her worsening mental health symptoms. *Id.* at 52. Similarly, the ALJ described M.D. "reading books" as a good activity of daily living, but as noted above, the ALJ does not explain how this solitary activity is inconsistent with M.D.'s claimed limitations, such as her anxiety going out in public. Nor does the ALJ explain how reading for pleasure and being able to start and stop reading at will is an activity that is "easily transferable to what may be the more grueling environment of the workplace, where it might be impossible to periodically rest." *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989), *superseded on other grounds by* 20 C.F.R. § 404.1502(a).

Another activity that the ALJ focused on in rejecting M.D.'s symptom testimony was her AA attendance "two-to-three times per week," which the ALJ believed was inconsistent with M.D.'s allegations that she is "scared of everything social." ECF No. 11-9 at 39–40. But in so finding, the ALJ ignored pertinent details in the record as to M.D.'s AA attendance. M.D. did in fact report feeling "anxious" about going to AA meetings. ECF No. 11-8 at 105. She was worried about "what others will think of her," and had to "discuss[] strategies" with her therapist "to help her cope in these situations." *Id.* M.D. even indicated at one point that she was planning on going "to a morning meeting near her home that she feels less anxious about attending." *Id.* M.D. also reported that she had to go to AA meetings "with either her mother or uncle or her friend" for support. *Id.* at 76. Moreover, M.D. testified at her March 2, 2018 ALJ hearing that she had "difficulty" with two AA sponsors, because they were both "critical" of her, which led to her crying and not reaching out to them anymore. ECF No. 11-3 at 102. All of this is consistent with M.D.'s testimony regarding her social interaction problems.

The ALJ also pointed to the fact that M.D. maintained "a healthy relationship with her mother," D.D., and went "shopping" with her.  ECF No. 11-9 at 41.  However, the record shows that M.D.'s relationship with D.D. was sometimes volatile.  At an October 30, 2017 appointment with her therapist, M.D. admitted that she and D.D. had "quarreled" because D.D. asked M.D. to help with their upcoming move.  ECF No. 11-8 at 101.  M.D. became "mean" with D.D., "verbally abusive," and "threw things."  *Id.*  Even if M.D.'s relationship with her mother was relatively stable, the ALJ does not explain how M.D.'s ability to get along with D.D. at home would be relevant to her ability to interact with co-workers on a full-time basis in a workplace setting.  As for M.D. going "shopping" with D.D., "[a]ctivities such as '[h]ouse chores, cooking simple meals, self-grooming, paying bills, writing checks…as well as occasional shopping outside the home, are not similar to typical work responsibilities.'"  *Baig v. Kijakazi*, No. 21-CV-01839-HSG, 2023 WL 3688453, at *8 (N.D. Cal. May 26, 2023) (quoting *Diedrich v. Berryhill*, 874 F.3d 634, 643 (9th Cir. 2017)).  The fact that M.D. went shopping "does not in any way detract from her credibility as to her overall disability" as "[o]ne does not need to be 'utterly incapacitated' in order to be disabled."  *Vertigan v. Halter*, 260 F.3d 1044, 1050 (9th Cir. 2001) (quoting *Fair*, 885 F.2d at 603).  Notably, the ALJ relied on medical records from December 20, 2016, where M.D reported "doing holiday shopping with [her] mother."  ECF No. 11-8 at 76.  There is no indication of how often M.D. went shopping, how much time she spent shopping, etc.  And in those same records, M.D. reported that she "[continued] to struggle with maintaining hygiene, doing the laundry, doing house chores" because of her "depressed mood" and her "low energy."  *Id.*

Finally, the ALJ also emphasized the fact that M.D. "reported going to the movies" and "going bowling."  ECF No. 11-9 at 42.  The ALJ cited to notes from a March 11, 2020 behavioral health intake appointment, where under a section entitled "Social Supports," and a subsection entitled "Meaningful Activities (*community involvement, volunteer activities, leisure/recreation, other interests*)" it indicates that M.D. liked to "[g]o to the movies, go bowling, read books."  ECF No. 11-14 at 553.  There is no other information provided as to how often M.D. engages in these activities, whether she is accompanied by anyone, whether these activities cause her any social anxiety, etc.  One brief reference to these two social activities with no supporting details does not

20

constitute a "clear and convincing reason" for rejecting M.D.'s symptom testimony, especially

since the Ninth Circuit has "recognized that disability claimants should not be penalized for

attempting to lead normal lives in the face of their limitations." *Reddick*, 157 F.3d at 722.

Moreover, in the same set of notes, it documents the fact that M.D. "report[ed] impairments in

social and relationship functioning as [M.D.] reports [symptoms] make her isolate and effects her

relationships with others," which is consistent with M.D.'s symptom testimony. *Id.* at 552. Given

all the above, none of the daily activities pointed to by the ALJ constitute clear and convincing

reasons for rejecting M.D.'s symptom testimony.

### C.   Lay Witness Testimony

In a Third-Party Adult Function Report and during two hearings before the ALJ, D.D.,

M.D.'s mother, corroborated M.D.'s allegations regarding her debilitating symptoms, including

the severe depression, anxiety, PTSD, poor concentration, and self-injurious behavior. ECF Nos.

11-3 at 106–10, 11-7 at 41–48, 11-9 at 76–78. The ALJ ultimately gave D.D.'s opinion "great

weight" during round one as it pertained to M.D.'s mental functioning during periods of alcohol

abuse, but "little weight" during round two as it pertained to her mental functioning during periods

of sustained sobriety. ECF No. 11-9 at 32, 43. The ALJ based this on "the same reasons

discussed regarding Dr. Guss's medical opinion," which as indicated above, were M.D.'s

alcoholism, the mental status examinations, her activities of daily living, and her psychological

test results.

"Lay testimony as to a claimant's symptoms is competent evidence that an ALJ must take

into account, unless he or she expressly determines to disregard such testimony and gives reasons

germane to each witness for doing so." *Lewis v. Apfel*, 236 F.3d 503, 511 (9th Cir. 2001). "One

reason for which an ALJ may discount lay testimony is that it conflicts with medical evidence."

*Id.* In addition, where the ALJ provides "clear and convincing reasons for rejecting [the

claimant's] own subjective complaints," and the lay witness testimony is "similar to such

complaints, it follows that the ALJ also gave germane reasons" for rejecting the lay witness

testimony. *Valentine v. Comm'r Soc. Sec. Admin.*, 574 F.3d 685, 694 (9th Cir. 2009).

Here, D.D.'s testimony was similar to M.D.'s symptom testimony, but the Court has held

above that the ALJ did not provide "clear and convincing reasons" for rejecting M.D.'s symptom testimony. Accordingly, those reasons cannot be a "sufficient basis" for rejecting D.D.'s testimony as well. *See Alice B. v. Kijakazi*, No. 20-CV-05897-DMR, 2021 WL 6113000, at *8 (N.D. Cal. Dec. 27, 2021) ("Because the court finds that the ALJ's reasons for rejecting [the p]laintiff's testimony were not supported by substantial evidence, the court cannot apply those reasons to [the p]laintiff's mother's testimony to find the error harmless."). In addition, the Court found that the reasons the ALJ gave for rejecting Dr. Guss's medical opinion were not specific and legitimate, and now finds that these reasons are also not "germane" reasons for rejecting D.D.'s testimony.

### D. Remand with Benefits

Finally, M.D. argues that if any of the above evidence which the ALJ rejected were credited as true, then she would be found disabled, and therefore, the Court should remand for automatic payment of benefits instead of further proceedings. In the Ninth Circuit, there is a three-part test to determine whether remand with instructions to award benefits is appropriate: "the record has been fully developed and further administrative proceedings would serve no useful purpose; (2) the ALJ has failed to provide legally sufficient reasons for rejecting evidence, whether claimant testimony or medical opinion; and (3) if the improperly discredited evidence were credited as true, the ALJ would be required to find the claimant disabled on remand." *Garrison*, 759 F.3d at 1020. "Remand for an award of benefits" is usually reserved for "rare circumstances." *Treichler v. Comm'r of Soc. Sec. Admin.*, 775 F.3d 1090, 1100 (9th Cir. 2014).

Here, the record has not been fully developed. There is an open question as to whether Dr. Guss considered M.D.'s alcohol abuse when evaluating M.D.'s mental functioning, which is crucial given that Dr. Guss was M.D.'s treating physician, and under the SSA regulations that apply to M.D.'s claim, her medical opinion would normally be given controlling weight. *See Rosemayer v. Saul*, No. 20-CV-06310-RMI, 2022 WL 445760, at *3 (N.D. Cal. Feb. 14, 2022) (remanding for further proceedings where medical opinion source "did not render an opinion regarding the interaction between [the p]laintiff's substance abuse and the symptoms and limitations of his mental impairments."). And if the ALJ decides to not give Dr. Guss's opinion

controlling weight, then the record needs to be developed as to the other regulatory factors under 20 C.F.R. § 404.1527(c) for her opinion as well as all other medical opinions (treatment relationship, specialization, etc.).

Moreover, M.D. bases her request for remand with payment of benefits on the fact that "the ALJ erred in the evaluation of [her] testimony, and in the evaluation of the medical opinions and the third-party report." ECF No. 14 at 29. But "[t]hese are exactly the sort of issues that should be remanded to the agency for further proceedings." *Brown-Hunter*, 806 F.3d at 495 (quoting *Treichler*, 775 F.3d at 1105). "The touchstone for an award of benefits is the existence of a disability, not the agency's legal error. To condition an award of benefits only on the existence of legal error by the ALJ would in many cases make disability benefits ... available for the asking, a result plainly contrary to 42 U.S.C. § 423(d)(5)(A)." *Id.* (internal quotation marks omitted). Accordingly, remanding with an award of benefits is not appropriate here.

## IV.    CONCLUSION

For the reasons stated above, the Court **GRANTS** Plaintiff's Motion for Summary Judgment, **DENIES** Defendant's Cross-Motion for Summary Judgment, and **REMANDS** for further proceedings consistent with this Order.

**IT IS SO ORDERED.**

Dated: August 1, 2024

_____
LISA J. CISNEROS
United States Magistrate Judge

United States District Court
Northern District of California